UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LANCE TEAGUE, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br>      v.<br><br>ALTERNATE ENERGY HOLDINGS, INC., DONALD GILLISPIE and JENNIFER RANSOM,<br><br>                Defendants. | Case No. 1:10-cv-00634-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is defendants' Motion to Dismiss Amended Complaint (Dkt. 31). The Court has determined oral argument would not significantly assist the decisional process and will decide the motion without a hearing. For the reasons expressed below, the Court will deny the motion to dismiss, as well as defendants' alternative request to stay this matter.

## BACKGROUND

Lead plaintiff Jerry Pehlke, Jr. represents a putative class of investors who purchased Alternate Energy Holdings, Inc. stock during the period October 23, 2006

MEMORANDUM DECISION AND ORDER - 1

through December 14, 2010.[1]

Plaintiffs describe Alternate Energy as a company that "*purports* to operate in the electric power generation industry by acquiring and developing nuclear plant sites and obtaining licenses for their construction and operation throughout the United States, especially Idaho." *Amended Complaint (FAC)*, Dkt. 29 ¶ 5 (emphasis added).  On December 14, 2010 – roughly four years after the company went public – the SEC temporarily suspended trading of Alternate Energy common stock.  Two days later, the SEC filed a securities fraud complaint, alleging that Alternate Energy is a sham operation with "no realistic possibility of building a multi-billion dollar nuclear reactor." *SEC Compl.*, Case No. 1:10-cv-621-EJL-REB (D. Idaho), Dkt. 1, ¶ 1.[2]  Plaintiff filed this action on December 20, 2011.  *FAC* ¶¶ 120, 122.

The SEC and plaintiffs in this case allege substantially the same misconduct. Most significantly, both allege that defendants engaged in two primary schemes to artificially inflate the price of Alternate Energy's stock:  (1) improper use of stock promoters; and (2) false press releases.

Regarding stock promoters, plaintiffs allege that individual defendant Donald

---

[1] More precisely, plaintiffs allege two class periods, based on two separate types of alleged securities fraud.  "Market Manipulation" claims are made on behalf of investors who purchased stock between October 23, 2006 through December 14, 2010, while "False Statement" claims are made on behalf of investors who purchased stock between March 31, 2009 and December 14, 2010.  *Amended Compl.*, Dkt. 29, ¶¶ 2, 3.

[2] In July 2011, the SEC filed an amended complaint, which adds some additional claims. *See First Amended Compl.*, SEC Action Dkt. 87.  In this fact statement, however, the Court refers to the December 16, 2010 complaint because the parties generally focus on the SEC's December 2010 actions.  *See, e.g., FAC* ¶ 13 (alleging that "[i]t was not until December 16, 2010, when the SEC instituted its civil action . . . that any reasonable investor or class member could have reasonably suspected" defendants' alleged fraud).

Gillispie "knowingly ordered stock promoters to manipulate the stock price by ordering them to buy company stock at the end of certain trading days so as to artificially inflate the stock's price and trading volume." *FAC* ¶ 42; *see also SEC Compl.* ¶¶ 2, 16. Plaintiffs flesh out this allegation with summaries of various email communications between individual defendant Donald Gillispie and stock promoter Billy Harbour. One such communication is described as follows:

> On January 17, 2007, Gillispie sent an email to Harbour, which stated: "Billy . . . .there is no evidence you have been buying stock today or any day recently at $1,00 or higher . . . I had someone buy 100 shares this morning at $1.20 and the stock jumped to that price accordingly . . . and then drifted down to 96 cents . . . please don't lie to me about this any more . . . it does not help in rebuilding your character now . . . ."

*FAC* ¶ 48.

The second major category of alleged misconduct involves false press releases. Plaintiffs allege that in September 2010, Gillispie caused Alternate Energy to release two press releases stating that no company director or "line officer" had ever sold any of their Alternate Energy shares. *See FAC* ¶ 62; *SEC Compl.* ¶¶ 19-20. But defendant Jennifer Ransom, a senior vice president of the company, sold one million shares between June and September 2010, and Gillispie allegedly sold some of his own shares through nominees. *FAC* ¶ 65-71; *SEC Compl.* ¶¶ 21, 25.

Plaintiffs also allege that another press release falsely stated that the company had not paid Pinnacle Digest to recommend its stock. *FAC* ¶ 104; *see SEC Compl.* ¶ 34.

In addition to the press releases and improper use of stock promoters, plaintiffs allege that defendants materially understated Gillispie's and Ransom's compensation on

the 2009 10-K, *FAC* ¶¶ 92-103; *see also SEC Compl.* ¶¶ 30-33.

In the SEC action, on December 16, 2010, the Court granted the SEC's *ex parte* application to freeze Alternate Energy's assets. Two months later, in February 2011, the Court entered a stipulated order lifting the asset freeze.

Meanwhile, on December 29, 2010, the SEC lifted its suspension, allowing Alternate Energy's stock to resume trading. The share price plunged. On December 13, 2010 – the day before the SEC suspended trading – Alternate Energy's stock closed at $.58 per share. On December 29, it opened at 6 cents per share and closed at 8 cents per share – thus losing over 85 percent of its value in a single day.

Plaintiffs focus on this drastic price drop to support their theory that defendants' fraudulent conduct caused their losses. As they put it, Alternate Energy's "stock price dropped catastrophically because the market became aware of the SEC's allegations that the Defendants knowingly or recklessly engaged in a fraudulent scheme and made materially false and misleading statements, as alleged in the Amended Complaint." *FAC* ¶ 126.

## MOTION TO DISMISS

Plaintiffs allege defendants violated section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5. Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The scope of Rule 10b-5 is coextensive with that of Section 10(b). *SEC v. Zandford*, 535 U.S. 813, 815 n.1 (2002). "In a typical § 10(b)

private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 156 (2008) (citation omitted).

This motion focuses on the sixth element of a Section 10(b) violation – loss causation. Loss causation is the causal connection between a defendant's material misrepresentation and a plaintiff's loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 344-45 (2005). "A plaintiff bears the burden of proving that a defendant's alleged unlawful act 'caused the loss for which the plaintiff seeks to recover damages.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting 15 U.S.C. § 78u–4(b)(4)).

In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 344-45 (2005), the Supreme Court held that a person who misrepresents the financial condition of a corporation in order to sell stock is only liable to a relying purchaser for the loss the purchaser sustains when the facts "become generally known" and "as a result" share value depreciates. To adequately plead loss causation, the Court held, a plaintiff must allege that the "share price fell significantly after the truth became known." *Id*. at 347.

1.     **Intervening Cause**

Alternate Energy argues that plaintiffs' efforts to allege loss causation are doomed because even assuming the market learned of and reacted negatively to the frauds alleged in the complaint, there are at least two intervening causes for the price drop: (1) the

SEC's "reckless" conduct in December 2010, and (2) the disaster at a nuclear plant in Japan, which was triggered by a March 11, 2011 earthquake.

### A.   The SEC's Conduct

Turning first to the SEC's conduct, defendants argue that there is only one reason Alternate Energy's share price dropped so drastically on December 29, 2010.  As Alternate Energy puts it, "while Plaintiff's allegation is that the stock price *lost almost all its value* as a result of the Defendants' alleged fraudulent conduct, the far more obvious reason that the stock price was *wholly decimated* was as a result of AEHI's[3] inability to do any business whatsoever when the SEC unilaterally decided to un-suspend trading of AEHI's stock at a time when all of its assets were frozen and the company had not yet had an opportunity to respond to the SEC's false allegations." *Mot. Memo,* Dkt. 32*,* at 13.  Given this purportedly "obvious reason" for the December 29 plunge in Alternate Energy's stock price, defendants argue that the Court cannot reasonably infer any other cause for the decline.

The Court is unpersuaded.  It is reasonable to infer that on December 16, the public learned of the fraudulent activity when the SEC filed its lawsuit.  It is further reasonable to infer that the market reacted negatively to that information, which caused the stock price to drop on December 29, 2011, when trading resumed.  Defendants may argue that the market was not specifically reacting to the fraud but that is simply their theory of the case; it is not the only obvious explanation for the December 29 share price drop.

---

[3] The parties use the acronym AEHI for Alternate Energy Holdings, Inc.

**MEMORANDUM DECISION AND ORDER - 6**

The Court notes that plaintiffs are not entirely clear as to precisely when the market learned the "truth" about defendants' alleged misconduct. In a section of the complaint entitled "Loss Causation and Damages," plaintiffs allege: "The relevant truth concerning Defendants' fraudulent conduct entered the market on December 14, 2010, at 9:30 a.m. E.S.T., at which time the SEC issued an order to temporarily suspend trading of the Company's common stock." *FAC* ¶ 120. Earlier in the complaint, however, plaintiffs peg December 16, 2010 as the day the market learned the truth:

> It was not until December 16, 2010, when the SEC instituted a civil action . . . that any reasonable investor or class member could have reasonably suspected that the Company's statements with respect to Defendants' Company stock positions and compensation were false and misleading. Nor could investors have reasonably suspected that the Company and certain of its officers were engaging in a scheme to artificially inflate the Company's stock price.

*Id.* ¶ 13.

Defendants take issue with this inconsistency (as well as plaintiffs' related arguments), gleefully pointing out that "Plaintiffs are unable to understand their own allegations!"[4] *Reply*, Dkt. 37, at 6. Granted, plaintiffs' complaint is inconsistent on this point. And, based on the allegations in this complaint, the Court does not have grounds to infer that the market learned the details of defendants' alleged conduct at 9:30 a.m., E.S.T., on December 14, 2010. The complaint does not allege any factual revelations that accompanied the trading suspension.

---

[4] The litigants in this action tend to shrillness. They label each other as "frivolous," "vicious," "outrageous," and so on. The Court does not find such rhetoric persuasive and is hopeful that future briefs will adopt a calmer tone.

MEMORANDUM DECISION AND ORDER - 7

But the larger point is that just two days later – while trading was suspended – the SEC filed its complaint which details defendants' alleged fraud. And four days after that, plaintiffs filed their own complaint – again, while trading was suspended. Under these circumstances, it is plausible that the market reacted to defendants' specific acts on December 29, when trading resumed. At a minimum, it is reasonable to infer that defendants' alleged frauds were a substantial (if not the only) cause for the December 29 price drop. The Court thus finds that plaintiffs have adequately pled loss causation.

The foundation for this holding begins with Ninth Circuit authority holding that a "plaintiff is not required to show 'that a misrepresentation was the *sole* reason for the investment's decline in value' in order to establish loss causation." *In re Daou Sys, Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (emphasis added by *Daou*, citing *Robbins v. Koger Props, Inc.*, 116 F.3d 1141, 1447 n.5 (11th Cir. 1997)). "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'" *Id.* (citation omitted). Further, in *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011), the Supreme Court acknowledged that when there is more than one cause for a particular loss, securities fraud plaintiffs will prove loss causation *only to the extent* the fraud caused the loss:

> As we made clear in *Dura Pharmaceuticals*, the fact that a stock's "price on the date of purchase was inflated because of [a] misrepresentation' does not necessarily mean that the misstatement is the cause of a later decline in value. We observed that a price drop could instead be the result of other intervening causes, such as 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events.' If one of those factors were responsible for the

loss or part of it, a plaintiff would not be able to prove loss causation *to that extent*."

*Id.* at 2186 (emphasis added; all internal citations omitted; quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005)).

In short, the loss causation analysis can be more complex than Alternate Energies would have it. This point is underscored in *In re Gilead Sciences, Inc. Securities Litigation*, 536 F.3d 1049 (9th Cir. 2008). There, plaintiffs brought a Rule 10b-5 claim, alleging that Gilead unlawfully marketed one of its drugs. *Id.* at 1050-51. On August 7, 2003, the FDA publicized a warning letter detailing Gilead's illegal marketing practices. *Id.* at 1053. The warning letter did not have an immediate effect on stock price – Gilead's share price closed at higher prices than they opened on both August 7 and August 8. *Id.* Plaintiffs, however, alleged that unbeknownst to the investing public, the disclosure of the FDA's warning letter detrimentally affected drug sales. *Id.*

The stock price eventually dropped a few months later, on October 29, 2003 – the day after Gilead issued a press release detailing third quarter financial results. *Id.* at 1054. The public learned that the drug's sales fell significantly below expectations. *Id.* Plaintiffs attributed their losses to the 12% decline in stock price that occurred on October 29. *Id.* at 1056.

The district court dismissed the complaint, concluding that "'it could not make 'the unreasonable inference that a public revelation on August 8 *caused* a price drop *three*

*months later* on October 28.'"[5] *Id.* at 1057. Additionally, regarding the warning letter's alleged impact on drug sales, the district court found "'a slowing increase in demand, alone, too speculative to adequately demonstrate loss causation.'" *Id.*

The Ninth Circuit reversed, holding that "the October drop in stock price was plausibly caused by the Warning Letter." *Id.* at 1058. The court began its analysis with a basic observation: "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact." *Id.* The court acknowledged that a district court need not make unreasonable inferences, but explained that "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The court further explained that normally, loss causation will be a matter of proof at trial – not an issue to be decided on a Rule 12(b)(6) motion. *Id.* (citing with approval *McCabe v. Ernst & Young,* LLP, 494 F.3d 418, 427 n.4 (3d Cir. 2007) ("loss causation becomes most critical at the proof stage) *and Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2005) (loss causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.")).

Here, plaintiffs' loss causation theory is less complex than was the Gilead plaintiffs'. And while defendants have put forth a potential alternative explanation for plaintiffs' losses (the SEC's conduct), this explanation by no means renders plaintiffs'

---

[5] It appears that the district court was off by a day. The company issued the press release on October 28, after the markets closed, and prices fell the next day, October 29. *See* 536 F.3d at 1056.

competing loss causation theory facially implausible.

### B. The Japanese Nuclear Disaster

In an extremely terse argument (four sentences), defendants argue that "Fukushima Daiichi nuclear disaster" is a separate intervening cause that prevents plaintiffs from pleading loss causation. *Mot. Memo.*, at 16-17. This argument fails at the outset because it requires the Court to judicially notice the "fact" that the disaster "substantially altered the nuclear industry in the United States." *Id.*

The Court may judicially notice the fact that an earthquake occurred in Japan on March 11, 2011 and the fact that the earthquake triggered a disaster at the Fukushima Daiichi nuclear power plant. These facts are not subject to reasonable dispute and are either "generally known" in the community or "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." *See* Fed. R. Evid. 201(b). But the impact the disaster may have had on the American nuclear power industry (and, more specifically, Alternate Energy's stock price) is not the sort of "fact" that is capable of judicial notice. Additionally, defendants have not adequately explained why the March 11, 2011 nuclear disaster would make it impossible for plaintiffs to prove that defendants' alleged frauds caused their losses. As with the defendants' theory regarding the SEC's "reckless" conduct, the Court is not required to accept defendants' theory of the case on a Rule 12(b)(6) motion.

In sum, the Court rejects defendants' intervening cause arguments.

**2.      Impact**

Likewise, the Court is not persuaded that plaintiffs are improperly relying on an "impact" theory to demonstrate causation. *See Mot. Memo.*, at 12. Here, defendants rely principally on two recent Ninth Circuit cases distinguishing between fraudulent conduct and the "impact" of that conduct – *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) and *In re Oracle Corp. Securities Litigation*, 627 F.3d 376 (9th Cir. 2010). Both cases are distinguishable.

In *Oracle*, a software company missed a quarterly earnings forecast by two cents. Its stock price dropped. Plaintiffs, who had purchased common stock between quarters, brought a securities fraud action alleging that the miss was caused by a scheme to defraud the public about the quality of Oracle's products. *Id.* at 382-83.

The majority of the Ninth Circuit's "impact" discussion focused on plaintiffs' allegation that defendants fraudulently concealed defects in a software product known as Suite 11i. *See id.* at 392-94. Under plaintiffs' theory, Oracle's March 2001 earnings miss revealed the "truth" about these previously concealed defects. *Id.* at 393. The Ninth Circuit affirmed summary judgment, however, because the "overwhelming evidence" indicated this was not so. The evidence showed that "the market understood Oracle's earnings miss to be a result of several deals lost in the final weeks of the quarter due to customer concern over the declining economy." *Id.* "In other words, the market reacted to reports of Oracle's "poor financial health generally." *Id.* at 393 (citing *Metzler*, 540 F.3d at 1063).

The *Oracle* Court rejected plaintiffs' argument that they should be able prove loss

MEMORANDUM DECISION AND ORDER - 12

causation by showing that the market learned of the purported "impact" of the alleged fraud – the earnings miss – rather than the fraud itself. *Id.* at 392. As the court explained, the loss causation analysis is more exacting: "Loss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction." *Id.* (citing *Metzler*, 540 F.3d at 1063). Significantly, however, the *Oracle* court delved into the evidence to ascertain precisely what the earnings miss (the "impact") revealed to the market. Ultimately, the earning miss could not serve as a "corrective disclosure" because it did not reveal any previously concealed truth.

Although *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) was decided on a 12(b)(6) motion, it stands for a similar proposition – namely, that any so-called "corrective disclosure" must teach the market about the alleged frauds.

In *Metzler,* the plaintiff alleged that defendant Corinthian Colleges fraudulently manipulated student enrollment records to boost federal funding. *Metzler*, 540 F.3d. at 1055. The plaintiff claimed that the truth was revealed in a June 24, 2004 Financial Times story and an August 2, 2004 earnings announcement. *Id*. at 1063. Affirming a Rule 12(b)(6) dismissal, the Ninth Circuit explained that the plaintiff had not alleged the announcement "disclosed – or even suggested – to the market that Corinthian was manipulating student enrollment figures[.]" *Id*. The court rejected the plaintiff's argument that it should simply infer that the August 2 announcement was "understood by the market" as a "euphemism" for improper enrollment practices, because there were no facts

**MEMORANDUM DECISION AND ORDER - 13**

suggesting "that on August 2 the market became aware that Corinthian was manipulating student records . . . ." *Id.* at 1064.

*Oracle* and *Metzler* are distinguishable. Defendants in this case argue that the impact of their alleged fraud was the SEC's conduct – and that that "impact" is what caused the stock price to plummet. *See* Reply, Dkt. 37, at 5, 6. But unlike the earnings miss in *Oracle* or the media story and earnings announcement in *Metzler*, it is plausible here to infer that the SEC's actions (the lawsuit, namely) revealed defendants' alleged fraud to the market. It is further plausible to infer that on December 16, 2010, the market learned of defendants' alleged frauds, and reacted to those frauds the next trading day – December 29, 2010. The Court will deny defendants' motion to dismiss.

## ALTERNATIVE STAY REQUEST

The Court will also deny defendants' alternative request to stay this action until the SEC action is resolved. A district court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706-707 (1997) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).

The Supreme Court long ago established that "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis*, 299 U.S. at 255. The party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Id*.

Consistent with this authority, the Ninth Circuit requires district courts to weigh the following factors when evaluating whether a stay is appropriate because another, similar lawsuit is pending:

    (1) the possible damage that may result from granting a stay;

    (2) the hardship or inequity that a party may suffer in being required to go forward; and

    (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."

*Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citation omitted).

More generally, district courts should not stay its proceedings "unless it appears likely the other proceedings will be concluded within a reasonable time." *Leyva v. Certified Grocers of Cal., Ltd*, 593 F.2d 857, 864 (9th Cir. 1997). Further, if a stay is granted, it should not be indefinite. *Dependable Highway Express, Inc. v. Navigators Ins. Co.,* 498 F.3d 1059, 1066 (9th Cir. 2007)

**1.     Harm to Plaintiffs**

Regarding the first specific factor – harm to plaintiffs – the Court finds, by a narrow margin, that plaintiffs have shown a "fair possibility" they will be harmed if a stay is imposed. They contend defendants do not have sufficient assets to satisfy a judgment. Plaintiffs also indicate that available insurance funds would likely be used up in the SEC action, potentially leaving nothing for them. Finally, plaintiffs contend that the SEC is not obligated to turn over any monies it recovers to plaintiffs.

Defendants argue that plaintiffs' asserted "harm" is based on speculation. The Court agrees that a defendant's ability to satisfy a judgment will almost always involve some degree of speculation; but plaintiff's concerns are accorded more weight because of the nature of their allegations; among other things, they allege that Alternate Energy has no revenue. *FAC* ¶ 38 ("Throughout the Class Periods, AEHI did not earn a single dollar in revenue."). Further, the language from the Supreme Court is a fair *possibility* of harm. *Landis*, 299 U.S. at 255. Certainty is not required.

Defendants also point out that a mere delay in obtaining a monetary judgment is not a sufficient harm. But the case defendants rely upon for this point – *CMAX, Inc. v. Hall*, 300 F.2d 265 (9th Cir. 1962) – is distinguishable. In, *CMAX* the district court properly stayed a federal action while the plaintiff in that action defended itself in a civil enforcement proceeding. *Id.* at 266. But, unlike here, there was no suggestion that the enforcement proceedings would somehow impact the defendants' ability to pay any judgment; the federal court defendant was not even involved in the enforcement proceedings.

2.     **Hardship or Inequity to Defendant**

As for the second factor, defendants have failed to make out a "clear case" of hardship or inequity. They indicate that plaintiffs might recover both in the SEC action and this action, but any such double-dipping would be simple enough to resolve in a damages calculation.

Defendants also indicate that if the two cases proceed together, they will be forced to engage in duplicative discovery. The Court finds that duplicative discovery – standing

alone – is not enough to show a "clear case" of hardship or inequity, particularly where defendants could seek to resolve these issues by requesting consolidated discovery proceedings.  *See* Fed. R. Civ. P. 42(a) (courts "may" consolidate actions that involve a "common question of law or fact").

### 3.     The Orderly Administration of Justice

As for the third factor – the orderly administration of justice – there is no denying that the facts and issues in this case are substantially similar to those raised in the SEC action.  The Court agrees that this may give rise to the specter of inconsistent judgments.  But this does not necessarily mean this Court must stay this action.  Defendants could address these concerns by seeking consolidation.  Further, the Court is not persuaded by defendants' argument that plaintiffs cannot possibly calculate their damages until after the SEC action is over.  *See Mot. Memo.*, at 20.

### 4.     Reasonable Time

Finally, in practical terms, the defendants are requesting a lengthy stay.  Trial in the SEC action is not scheduled until October 2012.  Additionally, while the parties in that action have not requested an extension of the trial date, they have stipulated to the extension of other, pre-trial deadlines, as well as a limited stay of discovery proceedings.  *See Oct. 29 Order* (SEC Action Dkt. 115) (discovery stayed until February 1, 2012).  Given these extensions, it seems possible that the trial date might ultimately be extended as well.  The Court is not willing to impose such a lengthy stay; even if trial begins as scheduled, this matter would be stayed for nearly a year.

**ORDER**

Defendants' Motion to Dismiss (Dkt. 31) is **DENIED**. Defendants' alternative request for a stay of this action pending resolution of the SEC action is also **DENIED.**

Plaintiffs' unopposed Request for Judicial Notice (Dkt. 36) is **GRANTED.**

DATED: December 19, 2011

B. Lynn Winmill
Chief Judge
United States District Court